Thank You Judge Clifton and may it please the court my name is Mark Caldwell I'm representing Ms. Ruiz this morning in the Social Security Disability Appeal taking my cue from the court I will keep track of my own time but I am going to try to reserve five minutes for rebuttal depending on how many questions I get. There are several issues in this case but I'm going to take them in the order that I think is most dispositive and of course the most dispositive piece of evidence in this case is the assessment of the treating nurse practitioner in P.M. mask. Correct Your Honor correct a certified physician's assistant and the reason I emphasize that is under Social Security ruling 063 P it's a certified physician's assistant that's considered an other source that is qualified to give an assessment as to the severity of a of an applicant's impairments so this isn't the type of physician's assistant who just comes in and takes your blood pressure before the doctor walks in the front door we're talking about a higher level of skill than that as again recognized in the considerable amount of treating experience with Ms. Ruiz and she gave assessments that led to uncontested vocational expert testimony that those limitations would preclude sustained work now up against that the ALJ reached back to the doctors who never laid eyes on Ms. Ruiz who completed assessment forms as part of the initial and reconsideration determinations which as you know were done by the state agency before their request for hearing is filed and she said those are entitled to the greatest weight what's very interesting about that as the court is aware is the ALJ also gave little weight to the opinion of a consultative examiner and what was the reason that the ALJ gave the ALJ gave the reason that the consultative examiner did not have the to the opinions of the doctors who never even laid eyes on Ms. Ruiz. So the ALJ's decision contains its own refutation. One question for you counsel about the form that that the nurse mask filled out was there any evidence in the record as to how this form was completed did she I don't recall any testimony from her as to how the form was completed. I'm not sure I understand the question I know that I know that Ms. Ruiz made an appointment and she was the progress note for that day says paperwork to be filled out for disability. Is that the answer to your question? Here's my question is that it's one thing for someone to take a form like this and I'm looking at ER 549 and check boxes. Right. So it would be one thing if the nurse actually administered the tests and then as she was administering certain tests she would check the boxes. It's another thing if the nurse would simply ask Ms. Ruiz questions and say how you know describe your pain oh it's intense check box intense. Was there any testimony in the record or how this form was in fact filled out. Was it the nurse actually doing tests and then based on that filling out the boxes or was it the nurse simply asking Ms. Ruiz questions and when Ms. Ruiz would answer the questions she would simply check the boxes. There's certainly no evidence to support the latter supposition that she merely asked Ms. Ruiz what can you do and wrote it down. No evidence of that is true. But that doesn't obviate the long-term treating experience that Ms. Mask had with Ms. Ruiz and neither it also ignores and this is an extremely important point in my opinion that it was N.P. Mask who referred the claimant for the diagnostic testing that showed severe degenerative spinal changes that eventually in April of 2011 led to the spinal surgery. So it's not a matter of N.P. Mask performing an examination on the very day that she completed this form. It's a matter of N.P. Mask having a longitudinal treating experience with this individual and being aware of the diagnostic testing that N.P. Mask herself ordered. So your point is that even if that day was a check the box exercise, it was not based merely on what Ms. Ruiz was saying, it would be based on the history between this  Absolutely. Absolutely. Your Honor, I have a little trouble hearing. Can I ask you to return the favor and yell into the microphone a little bit? You keep saying N.P. Mask. Do you mean physicians? I do. I'm confusing nurse practitioner with physicians. I started it. Are there treatment notes in the record that bear out the form she prepared? You say that she had a long history of treating Ms. Ruiz, but are the treatment records that she filled out for each visit consistent with the form she filled out Yes. It would be pretty hard for me to go through it page by page, but of course my brief doesn't do indeed go through it page by page. But she had positive findings on examinations, and I'll just pick one to illustrate. She had positive straight leg raising test. A straight leg raising test is when you're in the sitting or supine position, and the physician or physician's assistant in this point basically takes the sciatic nerve. If the person feels a shooting type pain down the leg when the sciatic nerve is stretched, that is positive for findings along the lines of a herniated disc, which is in fact what happened here. But she said she was doing better after the spine surgery. Do we have anything in the record other than her clinical observations as to how she was doing after the spinal surgery? Well, keep in mind that the spinal surgery was in April of 2000, and the hearing was in June of 2000, so we have a very, it was very shortly after that spinal surgery that she was testifying about her condition. And I think it goes to her credit, because she didn't say, oh, this didn't help me at all, I'm just as bad as I used to be. She actually said, this has improved the pain going down one of my legs. So she did report some improvement, but again, that does not obviate the other symptoms from which she was suffering, which was primarily the primary low back pain, because the laminectomy just takes the pressure off of that nerve that's going down the legs, and so you would expect the leg symptoms to improve, but that doesn't do anything about the underlying spinal condition itself. But my question is, other than her statement that she was doing better, is there anything in the record as to her condition post-surgery? Other than a note that I recall, you know, doing well, which means you don't have an infection from the surgical site and things along those lines, but in terms of functioning, no. But I would also make this point, a point that I think is frequently overlooked. The claimant's testimony is itself evidence. And I criticize that in my brief, because we have the standard language in the ALJ decision that the claimant's testimonies are inconsistent with the residual functional capacity determination. Well, that's flipping everything on its head, because basically what that's saying is I have determined what I think this person is capable of, and they have said something different, so therefore they're not credible. The claimant's testimony itself is a factor that should be considered when determining the claimant's residual functional capacity. So you don't determine the claimant's capacities first and then say, well, the claimant testified to something different because the claimant isn't credible. That's circular reasoning. You consider the claimant's testimony as evidence, and considering the credibility of that testimony, you factor that in to the determination of the claimant's work capacities. So I guess I switched a little bit here from talking about physician's assistant mass to talking about the credibility determination, but I think it's logical to say that the credibility of a claimant's testimony is something that is important, because obviously any treating source is going to rely to some extent upon the patient's reported symptoms. In that regard, just to very quickly switch over, because I do want to reserve my time, the ALJ relied upon what were called activities of daily living. There was no indication in this record at all as to the extent of those activities of daily living. She did some walking. She walked her niece to school. I noticed when I was reviewing the record last night at 122, she put in her report, it takes me 40 minutes, and it's two blocks away. So that gives you an idea of how fast Ms. Ruiz was able to move. So there's the credibility determination is flawed, but there's an underlying logical fallacy, and that's the fallacy of determining the work capacities first and then using that to say that the claimant is not credible. May I reserve for my remainder? Thank you. Good morning. May it please the Court. My name is Chad Troop, and I'm here on behalf of Carolyn Colvin, the Acting Commissioner of the Social Security Administration. The ALJ in this case crafted an extremely narrow RFC finding that for the less than the full range of sedentary work that it imposed numerous limitations to specifically account for Ms. Ruiz's impairments. Importantly, the ALJ's RFC finding in this case was more restrictive than any acceptable medical source opinion of record. In crafting this RFC finding, the ALJ actually gave Ms. Ruiz the benefit of the doubt on numerous different limitations and imposed limitations that went beyond what any acceptable medical source believed were necessary. For example, the state agency reviewing positions opined that she could perform a range of or was capable of lifting up to 20 pounds. However, the ALJ gave Ms. Ruiz the benefit of the doubt and further limited her to lifting only 10 pounds. Well, was the limitation greater than anybody who had actually seen her? The only person who opined that she had greater limitations than the ALJ was Ms. Matthews. And I should say, the regulations control. I'm not sure the regulations in dealing with the physician's assistant or a nurse practitioner is catching up with what's happened in medicine today. I don't think it's unusual for people to be treated by somebody who doesn't qualify as an MD. That's just modern medical economics. And in this case, I understand that a physician's assistant qualifies as an other source, not like she's a physician. But she is the person who's most experienced with the claimant. And when I looked at the ALJ's decision as to why it was that source was discounted, I didn't find much specific. I found conclusory statements. In particular, it says that the claimant does not support the medical evidence, does not support these restrictions or the activities of daily living described in the record. And then there's the jump and the term doctor is used. They didn't mean doctor, but it says it appears the doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant and seemed to uncritically accept as true most, if not all, of what the claimant reported. And that's kind of the end of it. Is that the only basis for rejecting the conclusions or the recommendations of the physician's assistant? No, Your Honor. And I think that, I mean, I guess to go to what Judge Owens was asking, he was asking what was the basis for this. I mean, if you take a look at Ms. Mask's report from that day, she did not conduct any physical examination on that date. But, I mean, it's not unusual to send a physician a form. In this case, it's filled out not by a physician, but to send a form for somebody who's that person's patient. And a lot of our forms are check-the-box type forms. Is there any indication she was just making up as she's going along or didn't base the answers in the form to the experience she'd had with that patient? Well, I believe so, because not only did she not conduct an examination on the date that she rendered this opinion, her treatment notes from months prior to that, I mean, months in May of 2010, April of 2010, they all failed to contain the type of clinical examination and findings that you would expect to find from someone that's disabled. They didn't contain any sort of indication that she was having trouble with her gait. They didn't have any indication that she had any problems with her motor strength. The only thing that you really see in those months leading up to that assessment is maybe some slight swelling of her lower extremities. But for the most part, Ms. Mask's own examination notes prior to that failed to contain the type of significant clinical findings that you would expect to support an extremely limiting opinion that she had. And that's the conclusion given by the ALJ. Shouldn't the ALJ be expected to explain the basis for the conclusion? Well, one thing I think that the ALJ did here, I think the ALJ gave a very detailed credibility finding, discussed why the medical evidence did not support Ms. Ruiz's testimony. And I think that the ALJ here incorporated that prior analysis by reference here. I mean, if you take a look at this paragraph, he says, you know, yet as explained elsewhere in the decision, there exists good reasons for questioning the reliability of the claimant's subjective complaints. And so I think he's incorporating by reference that prior analysis where he specifically discusses the fact that Ms. Ruiz had normal gait, normal posture, normal range of motion, normal motor strength when discussing that credibility. Because the ALJ's conclusion was that this form appeared to be based largely on those subjective complaints. So I think that it would be, you know, unnecessarily technical to require the ALJ to engage in that same analysis. Again, repeat that same analysis when he's incorporating that prior discussion by mentioning that it was explained elsewhere in the decision. Counsel, one thing the ALJ does do is talks about how Ms. Ruiz didn't follow certain medical advice or didn't follow up with appointments and maybe wasn't taking some medication. I could see in certain cases that being a very serious problem for the patient, they're not going to walk, but they're not going to physical therapy. I could see that. Can you explain here why the missed appointments or missed medical procedures that Ms. Ruiz allegedly missed, why is that significant to the disability at issue in this case? Well, Ms. Ruiz is alleged here that after she had surgery, and I believe it was November 2010, that after that she was unable to walk, couldn't stand on one leg, and she did not report to any follow-up appointment. She did not report to any follow-up appointments after her surgery for a period of four months. Now, when she finally showed up to the doctor four months later, I mean, she didn't allege that she couldn't show up to the doctor because of her impairment or because she was unable to afford the treatment, which, you know, an ALJ might find that that's an excusable reason. Here she made some mention about it was due to her living arrangements and some family issues, which I don't think those reasons necessarily excuse her, the fact that she did not go in to follow-up appointments. So if her issues with her leg were as severe as she claimed following her knee surgery, we would expect that she could show up to a doctor's appointment regardless of what her family issue or unexplained family issues or living situations were. But is there any authority in either the regulations or the case law that you're aware of that would permit a court to say, almost like a penalty, saying, look, if you want benefits, you better show up to the doctor, and if you don't show up to the doctor, you better not show up to the doctor? I mean, in the credibility regulations at 416.929, it indicates that the judge should consider treatment, and the failure to attend these treatment is a factor that is, you know, ALJs regularly use and are justified to use as discounting that credibility. But as to credibility, not almost like from the criminal law, some sort of exclusionary rule. There's no sanction other than being able to hold it against them in terms of credibility that you're aware of. There is a, there is a, if someone is able to restore their abilities, if someone is able to become not disabled by attending treatment, the judge can discount, can find that they're not disabled if they fail to do that. However, that's not what the judge, ALJ, did in this case. So I would say that that's not relevant to this case at all. And there are different regulations that it's outlined in one of the commissioner's regulations, but that didn't happen in this case. The ALJ only considered that as a negative credibility factor. And going to Ms. Ruiz's credibility, I mean, the ALJ gave some very strong reasons for discounting Ms. Ruiz's credibility. You know, I think one of the most striking things is that when Ms. Ruiz went to the administrative hearing, she testified that she had never left the house for a year and a half prior to the administrative hearing without using her walker. And she was very clear, said she had never left the house for a year and a half. Well, the medical records show that she consistently presented to her treating physicians during that time and was not using a walker at any of those appointments. In fact, even just three months prior to the administrative hearing, she admitted to her treating doctor that she had not been using her walker to ambulate. So the medical record, you know, directly contradicts Ms. Ruiz's testimony about her limitations, which I think is a very strong, you know, basis to believe that Ms. Ruiz was not using her walker. You know, for example, you know, we've talked about some of the daily activities. You know, Ms. Mask admitted, you know, the appellant has claimed that, you know, there's no evidence about, you know, the amount that she engaged in these activities. And I want to point out that ALJ didn't find that she was able to work or she was not disabled because she was able to care for her family or walk her niece to school. Rather, the ALJ just found that the evidence of those daily activities was inconsistent with her limitations. When she claims that she can't walk, she can't stand on one leg, yet she admits she's walking with her dad for exercise. And when she's walking her niece to school, and when she's, and she stated that she's... Is it true that she said it took her, what, 20 or 30 minutes to walk the two blocks? I mean, she reported that. However, I think the ALJ has looked at her... Isn't it appropriate to probe into what she said to see if that's really a contradiction? Sure. I mean, that certainly is, but... I mean, if somebody takes 20 or 30 minutes to walk two blocks, doesn't that suggest a limitation on capacity? I mean, I believe that, you know, Ms. Mask has alleged this. I believe the ALJ has... But you've identified that statement as a basis for doubting her credibility. So if you look at what that statement is, I'm not sure that really contradicts the statement, her claim to be disabled. Well, I think that if you look at the physical examination records throughout the record, none of the doctors in the record, none of them have, when she walked in, found that she was, like, walking with a gait, or that she was walking slowly. The examination records throughout the entire record show that she was walking normally, you know, that she was able to sit comfortably. I don't recall the last time that a physician watched me walk into the examination room. I'm always in the examination room, sitting on a table when the physician walks in, so... Do you have a different experience? I know that it's always in the record when people make these examination findings. It's a common finding that all doctors and physician assistants make. Well, let me ask this. What was her claim as to how long she could stand up? I believe that she, you know, I don't recall if she gave a specific amount of time. I know she said she was not able to engage in any prolonged standing. And the ALJ gave Ms. Ruiz the benefit of the doubt on many of these things by... I'm trying, if she needed to sit, stand well, and she could walk for 40 minutes, is that consistent with her need to sit, or could she stand? Was there testimony she could stand that long? I don't recall what her exact time. I know she said she was unable to engage in any prolonged standing. And the ALJ accommodated that subjective allegation by allowing her to alternate between sitting and standing at her own volition during the work day. So the ALJ specifically accommodated that by not requiring her to engage in any prolonged standing or sitting. It allowed her to alternate between those two positions. Well, let's focus for a moment on her best case. Her best case is the physician's assistant's written evaluation, albeit a check-off, and also her testimony. So you've dealt with the credibility of her testimony. Focus for a moment on Mass's evaluation. What, in the record, supports or contradicts Mass's conclusions based on Mass's observations of Ms. Ruiz prior to her testimony? Or to the evaluation? Well, I think the physical examination findings throughout the record, I think belie Miss Mass's opinion. I mean, the fact that she regularly had normal examination findings, normal gait, normal posture, normal motor strength, normal range of motion. Those type of clinical findings don't support the type of limitations that she's talking about. As I discussed earlier, when she presented to the doctor, when she presented to Ms. Mass, Ms. Mass only recorded her subjective complaints, indicated that she was having pain that prevented her from working, didn't conduct any physical examination on that date, didn't cite any clinical examination findings in her report there. So I think that when you take a look at it, she didn't conduct an examination on that date, she didn't support her opinions with any kind of reasoned analysis, any citation to any of the clinical examination findings. I think that strongly supports the ALJ's conclusion that this opinion was based largely on her subjective complaints. Ms. Mass's opinion was inconsistent with every acceptable medical source opinion of record. As acceptable medical sources, those opinions... And even your brief, when it got to discussing that subject, I mean, on page 29, you're talking about how it's inconsistent with other substantial evidence of record, including multiple acceptable medical source opinions. There's not a single citation there to anything. Now, earlier in the brief, there's a history given, but it's kind of being left to me to figure out what's it inconsistent with, because it never says at all. So how are we supposed to figure out whether it's consistent or not if we're not pointed to what exactly the inconsistency is? Well, when the ALJ's decision is read as a whole, you can see he's evaluating all these different opinions, and, you know, he ultimately gives specific, and instead I get a conclusion. I mean, is there anything specific in the ALJ opinion that says there's inconsistency with this medical opinion and this medical observation in rejecting the PA's report? Yes, Your Honor, and I believe it is. Please point me to it. I believe that when he incorporates, it says it has explained elsewhere in this decision, talking about the reasons he discounted the credibility. Elsewhere is not specific. But could you point me to where elsewhere he's specific on saying why it is the PA's report should be disregarded? I mean, I think that the ALJ's gave, I mean, if you take a look at, I mean, when he's talking about the, I mean, the medical examination records, talking about the level of, you know, functioning that is not displayed. And this is what gives me my problem. The ALJ and the briefs are written giving me a lot of medical history and then later a conclusion. And the conclusion would be a lot more effective and believable. In fact, you point to what in the medical history that otherwise doesn't mean a whole lot to me. I'm not a physician. So I hear what you're saying, but I sure wish the ALJ would do the work and your office would do the work of putting those two things together instead of expecting us to figure out what it is that's inconsistent rather than simply stating a statement, stating a conclusion that it's inconsistent. I know that there's maybe less than ideal level of clarity here, but I do think that the decision is sufficient to track the ALJ's reasoning when you consider his detailed analysis of credibility that is discussed earlier and his incorporation by reference of that same analysis. I believe my time is up. Thank you very much. I appreciate it. Thank you. And I respectfully request that you affirm the commissioner's decision. Well, I hate to help out the commissioner, but I did do it. Okay. What am I looking at? On page 20, the commissioner's brief, they say there's multiple opinions. In ER 27-39, that's Dr. Griffith, he's a non-examining state agency doctor. ER 27-34, that's Dr. Desai, another non-examining doctor who filled out an assessment form before the application was filed as part of a prior application. ER 338, Dr. Backlund, that's another non-examining state agency physician who filled out an assessment form in March of 2010. So I guess I did the commissioner's job just there, but I still think it helps my client's case, because what I'm pointing to and what I think we need to keep in mind here is that is what the ALJ relied upon in her assessment of Ms. Ruiz's work capacities, doctors who never even laid eyes on the claimant. What the commissioner has cited are the observations by doctors who did see her that she walked in, wasn't using a walker, had normal gait. Were there other observations? I've been to doctors just like you have. I know exactly what you're talking about. You know, I don't mean to be ---- I mean, there are a couple reports in there that say she used a walker, she came in with a walker or something. So those observations are sometimes made. And sometimes she did and sometimes she didn't. And if you look carefully at her testimony at ER 921 and ER 919, she says that sometimes I used it and sometimes I didn't. But the specific question that her counsel gave to her was, has there ever been a time during this particular time frame where you've left the house without the walker? That may seem like I'm splitting hairs here, but that's not the same as saying I was using the walker all that time. What that means is I had the walker available to me for those times when I did or did not use it. But she very clearly said early in her testimony, that sort of depends on the day. I've got good days and I've got bad days. And again, this goes to somebody who's being truthful. Now, you said something, Judge Clipton, that I wanted to address at the very beginning of opposing counsel's argument. You basically said, well, the regulations haven't kept up with reality. And, you know, I've been seen by nurse practitioners, I've been seen by physician's assistants, I know exactly what you're talking about. But I think ---- One, I refer to the ruling at 063P where the commissioner says the regulations that we use to evaluate treating physician opinions are also regulations that should be used to evaluate physician assistant assessments. And that's where, with all due respect, I believe Molina missed the boat. Molina treated a physician's assistant assessment as if it was lay testimony. The commissioner herself does not treat physician assistant assessments as if they're lay testimony. Let me find what it was you were just reading from. Where is it again? I wrote down, it was on my opening brief, page 21. Of course, you're going to have to let me get to my opening brief too. Yes. It's the first part of the big bold part where it says treating physician assistants. And then it says the ruling provides that the ---- this is the second paragraph ---- the regulations for evaluation of opinions from acceptable medical sources at 416.927 can be applied to opinion evidence from other sources. And that's where I think the commissioner is saying, you know, hey, those regulations do apply to this evidence. And I think this Court's discussion in some of the printed or published cases is pretty confusing, because it's hard to figure out whether this Court is treating that evidence as layperson evidence, which I respectfully submit it should not, or whether it's really looking at the commissioner's own ruling, which is recently, as Brown-Hunter in November said, are governing the commissioner's regulations. I am running out of time, and I don't want to take advantage. Are there any questions the Court would like to ask? We thank you for the argument. Thank you, judges. We thank both counsel for your helpful arguments. The case just argued is submitted.
judges: Clifton, Owens, Moskowitz